**HAWKES TELEVISION, INC.**

v.

**MAINE BUREAU OF CONSUMER CREDIT PROTECTION and Barbara Reid Alexander.**

Supreme Judicial Court of Maine.

Argued March 21, 1983.

Decided July 11, 1983.

Dennis Levandoski (orally), Portland, Terry Snow, Cumberland Center, for plaintiff.

Peter B. Bickerman (orally), Asst. Atty. Gen., Augusta, for defendant.

Richard P. Hackett, William Kayatta, Portland, amicus curiae.

Before GODFREY, NICHOLS, ROBERTS, CARTER*, VIOLETTE and WATHEN, JJ.

GODFREY, Justice.

The plaintiff Hawkes Television, Inc. ("Hawkes") appeals from a judgment in Superior Court, Cumberland County, holding that the company's "rent to own" program violates the Maine Consumer Credit Code. Hawkes also moves to dissolve an injunction issued by the Superior Court pending appeal. We reverse the judgment of the Superior Court and grant the motion to dissolve the injunction.

In August, 1981, the defendant Maine Bureau of Consumer Credit Protection ("Bureau") examined the records of Hawkes to determine compliance with the Maine Consumer Credit Code, M.R.S.A. tit. 9-A ("Code"). Hawkes is a Maine corporation that sells, rents and repairs televisions and stereo equipment from a store in Westbrook. At the time of the examination, Hawkes operated a "rent to own" program under which consumers could purchase television sets and stereo systems by making weekly "rental" payments to Hawkes, typically for 104 weeks. Under the terms of the rental agreement at issue, customers may rent a Curtis Mathes television set for a fixed weekly payment, which varies ac-

---

* Carter, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

cording to the type of unit rented, plus a $25 processing fee to be paid in advance. At the end of each week, the agreement automatically terminates, and the customer must return or have Hawkes retrieve the set unless he renews the agreement by paying another week's rent. If the customer makes 104 consecutive weekly payments, he becomes owner of the set without paying any additional consideration.[1] Otherwise, Hawkes retains title to the set. It may be used only at the location specified in the rental agreement. If the customer moves, he must notify Hawkes, which will move the set to the new premises without charge. The minimum rental period is one week. The Hawkes agreement is of a type generally known as a "rental purchase contract."[2]

A customer who completes a typical rental contract ($17 per week for 104 weeks for a 25-inch color console) pays $1,768 to own the television. The cash price for a comparable model sold by Hawkes is $939. In other words, customers who "rent to own" that model pay the equivalent of an annual interest rate of 70.52 percent over the two years of the contract. The only difference in servicing costs between a rental and a cash-sale television set is that all house calls after 90 days on the sales televisions are subject to a fee of fifteen to twenty dollars. While Hawkes prominently advertised the weekly rent necessary to obtain the unit, nowhere did the store disclose the two-year rent total. Hawkes concedes that its rental purchase contract, if treated as a consumer credit sale under the Code, would violate the Code's usury provisions.

Advertising for the rental program was aimed at and attracted customers who could not obtain more traditional credit. The advertisements promoted the program as a method of owning a television set without undergoing a formal credit check. Most rental customers intended to complete the 104-week payment schedule and 65 percent of them did in fact accomplish that goal.

In a report issued in October, 1981, the staff of the Bureau alleged that the rental program resulted in the making of "consumer credit sales" within the ambit of the Code and that the cumulative rental payments violated the Code's interest-rate ceilings. Hawkes and the Bureau attempted unsuccessfully to negotiate a settlement. On April 15, 1982, the defendant Superintendent of Consumer Credit Protection ("Superintendent") held a public hearing on the matter. On May 21, 1982, she issued a "Decision and Order" essentially affirming the staff report. She ordered Hawkes (1) to cease and desist in the use of its rental agreement; (2) to reimburse consumers for the alleged overcharges; and (3) to structure its programs to comply with applicable Code provisions. The Superintendent has not charged Hawkes with violating the disclosure provisions of the truth-in-lending article of the Code, 9–A M.R.S.A. art. VIII.

Hawkes brought a timely action in Superior Court pursuant to Rule 80B to reverse the Superintendent's decision. On October 19, 1982, the Superior Court entered a judgment affirming the Superintendent's decision in all respects. Hawkes's notice of appeal from the judgment was docketed in the Law Court on October 22, 1982. On November 12, 1982, the Bureau and Superintendent moved in Superior Court for an injunction requiring Hawkes to conform its conduct to the Superintendent's order. The court issued the injunction on November 18, 1982, finding that despite the Superintendent's unstayed cease-and-desist order Hawkes had continued to collect unlawful rental payments and to repossess or threaten to repossess merchandise held by consumers pursuant to such rental agreements.

---

1. The agreement does allow customers to return the set without paying for a 30-day grace period. The customer may retrieve the set within that time and continue payments without losing credit toward ownership for the previous payments.

2. *See* Note, *The Applicability of the Federal Truth in Lending Act to Rental Purchase Contracts,* 66 Cornell L.Rev. 118, 124 (1980).

On January 4, 1983, Hawkes filed a motion in the Law Court to dissolve the injunction pending appeal. We ordered that the motion be briefed and argued in conjunction with the merits of the appeal.

On appeal, John and Mary Hall, Amy Morse, and Shirley Preston ("Consumers"), who are customers of the Hawkes rental program, have filed an amicus curiae brief in support of the Bureau's cease-and-desist order.

## I. *Injunction Pending Appeal*

■ The Superior Court issued an injunction pending appeal against Hawkes well after the appeal was docketed in the Law Court. Ordinarily the docketing of an appeal divests the Superior Court of authority to take further action on a case. M.R. Civ.P. 73(f). Here, the only possible exception to Rule 73(f) is provided by M.R.Civ.P. 62(d), which authorizes the Superior Court to issue injunctions pending appeal as follows:

> When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Hawkes contends that Rule 62(d), by its terms, does not apply and hence the injunction was invalid for want of jurisdiction. The defendants answer, first, that Rule 62(d) does apply because the Superior Court effectively granted an injunction in its decision on the merits by affirming the Superintendent's cease-and-desist order; and, second, even if Rule 62(d) does not apply, the Superior Court had inherent power to grant the injunction.[3] We agree with Hawkes and hold the injunction invalid for lack of jurisdiction.

The Superior Court's decision affirming the Bureau's cease-and-desist order was not a "judgment granting ... an injunction" under Rule 62(d). Under the Code, a cease-and-desist order is not the same thing as an injunction. The Superintendent may choose either to seek an injunction in court pursuant to 9–A M.R.S.A. § 6–110 (1980) or to enter an administrative order to cease and desist pursuant to 9–A M.R.S.A. § 6–108 (1980). In this case, the Superintendent chose the latter procedure. Since the judgment appealed from did not include an injunction, Rule 62(d) does not apply. *See Shay v. Agricultural Stabilization & Conservation State Committee*, 299 F.2d 516 (9th Cir.1962) (construing Fed.R.Civ.P. 62(c), the federal counterpart of M.R.Civ.P. 62(d)); 7 *Moore's Federal Practice* ¶ 62.05 n. 3 (2d ed. 1982).

Rule 62(d), relating to the trial court, and Rule 62(g), relating to the Law Court,[4] merely declare the inherent power of courts to make orders to preserve the status quo and to insure the effectiveness of any eventual judgment. 2 Field, McKusick & Wroth, *Maine Civil Practice* § 62.2 (2d ed. 1970); *see United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 79–80 (9th Cir.1951) (per curiam); 11 C. Wright & A. Miller,

---

**3.** The defendants also argue that Hawkes's motion before the Law Court to dissolve the injunction was untimely and that Hawkes, with unclean hands, is not entitled to equitable relief in the form of dissolving the injunction. Neither argument has merit.

As we have stated many times, lack of subject-matter jurisdiction may be raised by a party or by the court itself at any stage of a proceeding, including on appeal. *Coates v. Maine Employment Security Commission*, 428 A.2d 423, 425 n. 3 (Me.1981).

With regard to "unclean hands," Hawkes is not seeking equitable relief in attempting to have an injunction dissolved for want of jurisdiction. Hawkes's conduct could not confer jurisdiction otherwise lacking in the Superior Court.

**4.** M.R.Civ.P. 62(g) provides as follows:

*Power of the Law Court Not Limited.* The provisions in this rule do not limit any power of the Law Court during the pendency of an appeal to suspend, modify, restore, or grant an injunction or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered.

*Federal Practice & Procedure* § 2904 (1973). Orderly management of this Court's appellate docket requires careful observance of the limitations in Rule 73(f) on the Superior Court's further jurisdiction over appealed cases. For that reason, the trial court's power to grant injunctions pending appeal is circumscribed by the provisions of Rule 62(d). The federal decisions applying Fed. R.Civ.P. 62(c) are not to the contrary: the federal trial courts have entertained post-appeal applications for injunctive relief within the letter of Fed.R.Civ.P. 62(c). *E.g., Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, *reh'g denied,* 415 F.2d 1376 (5th Cir.1969); *El-O-Pathic Pharmacy,* 192 F.2d 62; *Shinholt v. Angle,* 90 F.2d 297 (5th Cir.1937).

The Law Court is the proper forum for seeking an injunction pending appeal in cases not fitting within M.R.Civ.P. 62(d). Under Rule 62(g), the Law Court has the authority to "grant an injunction or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered." The Law Court's authority is not limited to cases where an appeal is taken from a judgment granting, dissolving, or denying an injunction. *See Board of Selectmen v. Kennebec County Commissioners,* 393 A.2d 526, 527 (Me.1978). However, the defendants chose not to proceed under Rule 62(g). The Superior Court had no authority in this case to issue an injunction after Hawkes's appeal had been docketed in the Law Court.

### II. *Consumer Credit Sale*

The Superintendent charges that the Hawkes rent-to-own agreement violates Code provisions limiting the amount of finance charge that a seller may contract for and receive in a "consumer credit sale." [5] The pertinent provisions of the Code defining "consumer credit sale" are as follows:

'Consumer credit sale':

A. Except as provided in paragraph B [not here relevant], a 'consumer credit sale' is a sale of goods ... in which:

(i) credit is granted ... by a seller who regularly engages as a seller in credit transactions of the same kind;

. . . .

(iv) either the debt is payable in installments or a finance charge is made; and

(v) with respect to a sale of goods ... the amount financed does not exceed $25,000.

9–A M.R.S.A. § 1–301(11) (1980 & Supp. 1982).

"Credit" is defined in Code subsection 1–301(15) as follows: " 'Credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."

As pertinent to this case, "finance charge" is defined in subsection 1–301(19) to mean the sum of "all charges payable ... by the consumer and imposed ... by the creditor as an incident to or as a condition of the extension of credit ...."

Finally, "sale of goods" is defined in subsection 1–301(33) as follows:

'Sale of goods' includes any agreement in the form of a bailment or lease of goods if the bailee or lessee agrees to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the goods involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the goods upon full compliance with his obligations under the agreement.

▰▰ The narrow issue is whether the Hawkes rental agreement constitutes a "consumer credit sale" within the meaning of subsection 1–301(11) of the Code. If so, it violates the Code's usury provisions; if not, those provisions are inapplicable.

Most of the arguments of counsel have addressed whether the Hawkes agreement constitutes a "sale of goods" within the meaning of subsection 33 of section 1–301.

---

**5.** 9–A M.R.S.A. § 2–201 (1980 & Supp.1982).

If that were the crucial question in this case, we might be able to affirm the decision of the Superior Court. However, other definitions require reversal. Subsection 11 requires that a "consumer credit sale" be one in which the seller grants credit for "the debt," and the definition of "credit" in subsection 15 confirms the inference from subsection 11 that a debtor-creditor relationship between consumer and seller must be created by the sale. Hawkes extends no credit to its rental customers. Without doing violence to the statutory language, we cannot hold that the Hawkes rental lessees are debtors of Hawkes in the sense of the Code or that Hawkes has extended them credit.

It is apparent that a Hawkes rent-to-own customer pays dearly for the privilege of renting his television set. In that respect his condition resembles the plight of a victim of usury. Nevertheless, the Code definition of "consumer credit sale" cannot possibly bear the meaning the Superintendent has assigned to it to bring the Hawkes rent-to-own agreements within the reach of the Code. It is true that the Code must be liberally construed and applied to promote its underlying purposes and policies, 9–A M.R.S.A. § 1–102(1). Yet, if the Hawkes agreements cannot come within the scope of the definitional language by any rational interpretation, the fact that the Code must be given a liberal construction does not avail. If the definitional provisions of the Code even left some doubt about the applicability of the Code, the Superintendent's interpretation would be entitled to due deference. Here section 1–301 leaves no room for doubt. This was not a credit sale under the Code. The mandate for liberal construction does not give the Superintendent or the courts authority to enlarge the coverage of the statute.

The entry is:

Judgment reversed.

Motion to dissolve the injunction granted.

All concurring.