**Roland K. CRONK, Plaintiff,**

v.

**Ezra Taft BENSON, Secretary of Agriculture, The United States of America, Joseph K. Turecek, Lindley Hollingsworth and Charles MacLean as the Arapahoe County Agricultural Stabilization and Conservation Committee, and M. C. McCormick, Leo L. Sommerville and Kenneth W. Thayer, as the Colorado State Committee of Agricultural Stabilization and Conservation Committee, Defendants.**

**Civ. No. 5999.**

United States District Court
D. Colorado.

June 23, 1960.

David J. Miller, Robert A. Ruyle, Greeley, Colo., for plaintiff.

Donald G. Brotzman, U. S. Atty., Charles M. Stoddard, Asst. U. S. Atty., Denver, Colo., Harold E. Hafer, Regional Atty., Rogers N. Robinson, Atty., Office of Gen. Counsel, U. S. Dept. of Agriculture, Denver, Colo., for defendants.

CHRISTENSON, District Judge.

The above-entitled action came on regularly for trial on April 7, 1960, and the Court having duly considered the evidence herein and being fully advised in the premises now finds the following:

### Findings of Fact

1. This action is brought under Title 7 U.S.C.A. § 1801 et seq. and particularly Section 1821 et seq., relating to the so-called Acreage Reserve Program under the Soil Bank Program.

2. The plaintiff, Roland K. Cronk, is a wheat grower who resides in Strasburg, Arapahoe County, Colorado, and owns or leases two tracts of land approximately 12 miles east and 24 miles east of Byers in Arapahoe County, a tract in Weld County, Colorado, and a tract near Strasburg, where he lives. For the crop year 1957 this land, together with additional land which he leased from Mrs. Edna L. Black in Adams County and from Mr. B. Emmet Bohan in Arapahoe County, was operated by Roland Cronk as "a farm" under the Acreage Allotment Program administered through the county Agricultural Stabilization and Conservation Committee for Arapahoe County, located at Byers, Colorado. The total acres in the farm were 4,660, of which 4,382 was crop land or tillable acres. The acreage allotment established for the farm by the Arapahoe County ASC committee for the crop year 1957 was 1,427 acres. Cronk's wheat allotment was 923 acres, Mrs. Black's wheat allotment was 407 acres, and Mr. Bohan's wheat allotment was 97 acres. The plaintiff was one of the largest operators of wheat farms in Arapahoe County.

3. Mr. Cronk lost his wheat crop in the years 1955 and 1956 due to drought and wind. Due to favorable moisture

conditions in the fall of 1956 he began seeding wheat on the farm on or about September 1, 1956, and completed the drilling or seeding operations on or about October 10, 1956, when he had seeded some 2,800 acres.

4. Some time after the middle of September, 1956, Mr. Cronk came to the county ASC office at Byers and discussed with the county office manager, Mr. Clifford Moody, the provisions of the 1957 Acreage Reserve Program and particularly the provisions of the form of contract utilized under the statutes and the regulations for the Acreage Reserve Program for that particular year. At that time Mr. Cronk made certain computations in an attempt to determine whether his prospects would be improved by entering into an Acreage Reserve contract.

5. On or about October 2, 1956, Mr. Cronk, Mrs. Edna Black, and Mr. Emmet Bohan signed a Soil Bank Acreage Reserve Agreement for 1957 involving winter wheat, by which they placed 713.5 acres, or one-half of the acreage allotment for the farm, in the acreage reserve. The acreage placed in the acreage reserve was identified on maps by fields and by section, township, and range. The amount of compensation to be paid per acre for participating in the Acreage Reserve Program and for compliance with the contract was $19.89 per acre. The share of the total compensation to be paid by the Secretary of Agriculture to each of the three parties (Mr. Cronk, Mrs. Edna Black, and Mr. Emmet Bohan) was also stated. The total compensation to be paid to the parties for compliance with the contract was $14,191.51.

6. This contract was signed on behalf of the Secretary of Agriculture by Lindsley Hollingsworth, as an authorized ASC county committeeman, on October 24, 1956.

7. In the Fall of 1956, Cronk told Bohan that he would wait as long as possible in the spring of 1957 before determining whether or not to comply with the contract by destroying the excess wheat.

8. There is no prohibition in the contract or in the applicable regulations against seeding wheat as a cover crop in excess of the allotment; however, the contract on its face provides that the maximum acres for harvest, or the so-called "permitted acres," is 713.5, or the difference between the allotment and the number of acres designated as being placed under the Acreage Reserve agreement. This same provision is spelled out under the "Terms and Conditions" of the contract, in section 3(a), which appear on the reverse side of the contract or are incorporated by reference therein.

9. During the spring of 1957, several notices were sent to and received by Roland Cronk, from the county ASC office, which indicated that according to measurement made by the officials at the county level, he had seeded in excess both of his acreage allotment of 1,427 acres for the farm and also of his so-called permitted acres of 713.5 acres under the Soil Bank Acreage Reserve Agreement mentioned above. These notices also advised the plaintiff, Roland Cronk, of the number of acres he would have to destroy to comply with each program prior to the final destruction date. The final destruction date for such excess acres was June 10, 1957 under both the acreage allotment and the Acreage Reserve Program.

10. During the spring of 1957 a very severe storm, accompanied by wind, destroyed practically all of the acreage seeded to wheat on the land owned by Mrs. Black in Adams County. At the request of Mrs. Black, Mr. Cronk reseeded, in late May and early June of 1957, 500 acres of her land to spring barley and 300 acres to milo. There was no prohibition against seeding any amount of acreage to milo or barley under the 1957 Acreage Reserve Program or under the 1957 acreage allotment program, contrary to the situation so far as wheat was concerned.

11. The destruction by the elements of this approximately 800 acres of wheat

on Mrs. Black's land, together with the partial destruction of approximately 140 acres on Cronk's land and a few acres on Bohan's land, reduced the amount of excess acres under the acreage allotment program and also under the Acreage Reserve program. After the damage done by the spring storms, there were approximately 1,900 acres of wheat standing. This meant that Cronk had about 500 acres in excess of his wheat acreage allotment of 1,427 acres and about 1,200 acres in excess of his permitted acres of 713.5 under the Acreage Reserve agreement.

12. As of June 7, Mr. Cronk may have felt some concern as to whether time, and perhaps the weather, would permit the destruction of these excess acres prior to the June 10 deadline. He had not theretofore determined to attempt in good faith to destroy the excess acreage, nor did he thereafter definitely decide to attempt to do so. He did, however, about June 7, make inquiry at the county level as to whether any notice had been received in the county office permitting an extension of time to destroy the excess acres. He was told by Mr. Moody, the county office manager, that the office had not received any notice of such extension of time.

13. Some time prior to June 7, Mr. Cronk and Mrs. Black discussed compliance with the contract, and Mr. Cronk told Mrs. Black that his wheat looked too good and he was not going to comply with the contract. Mr. Cronk then indicated that he thought it would be right for him to pay her share of the penalty. Mrs. Black told Mr. Cronk that she thought the contract should be complied with.

14. Some time prior to the deadline date for destruction on June 10, Mr. Cronk had a conversation with Mr. B. Emmet Bohan in which Mr. Cronk told Mr. Bohan that the wheat looked good and he could not afford to comply with the contract.

15. On two occasions, June 4, 1957, and June 28, 1957, Mr. Cronk sprayed to kill the weeds on certain of his acreage which was the poorer wheat, in order to improve such wheat.

16. During the early spring of 1957 there was an unusual amount of moisture in the form of rain and snow, as contrasted with the drought conditions which had prevailed in 1954 and 1955. Nevertheless the evidence on the daily totals of rainfall during the months of March, April, May, and up through June and July shows that on a number of days during the critical period there was no rainfall or precipitation and on others the amounts were negligible. Mr. Cronk testified himself that he planted 500 acres of barley and 300 acres of milo for Mrs. Black during late May and early June of 1957, in addition to a few acres on Mr. Bohan's land. Mr. Hollingsworth, a member of the county committee, who lives about a mile and a half from a substantial portion of the land operated by Mr. Cronk, 24 miles east of Byers, testified from his weather records that during the period May 18, 1957 to June 10, 1957, inclusive, only slightly more than one inch of rain fell in the area and that for the period June 1, 1957 to June 10, 1957, inclusive, no precipitation whatever fell in the area. Three local farmers testified that they had destroyed their excess acres prior to the June 10 deadline in order to get into compliance under the marketing quota program or in order to comply and to receive their payments under the Acreage Reserve program. One of these farmers, a Mr. Rhodes, said his land was only three or four miles from a substantial part of the land operated by Mr. Cronk. Mr. Rhodes destroyed 120 acres before May 22 to comply with his Acreage Reserve agreement. He lives on Section 30, Township 4 South, Range 57 West of the 6th P.M. Based on this evidence, I find that the weather conditions were not such as to have made it impossible for Mr. Cronk to have destroyed his excess acres by June 10, 1957 had he intended to do so. I do not believe he so intended, but on the contrary, I find that either in May or June had he desired to destroy

said excess wheat he could have done so without undue difficulty.

17. After the deadline date of June 10 had passed, the county committee had authority to negotiate with the producer in an attempt to work out a settlement acceptable to higher authority where failure to destroy all or part of the excess acres had taken place. With this in view, Mr. Cronk was asked to attend a regular county committee meeting on June 28.

18. So far as Mr. Cronk knew when he received the notice to attend the meeting at the county office on June 28, the deadline date of June 10 for destruction of his 1,200 excess acres to comply with the Acreage Reserve agreement had passed. He knew also that he could harvest 713.5 permitted acres without being liable to pay any harvesting penalty. He had approximately 1,900 acres of wheat standing and he must have known, according to the contract and the Terms and Conditions, that if these 1,200 excess acres were harvested he would be subject to a penalty of 50 per cent of the compensation payable under the contract. I believe that he considered it possible that it would be more advantageous to him to harvest the excess wheat despite the penalty. And in view of his natural antipathy toward the destruction of good crops, he was reluctant to destroy the excess acreage unless it could be demonstrated that it would be decidedly to his advantage to do so.

19. A few days prior to the scheduled meeting of June 28, the county office received a notice or letter from the State ASC office which authorized the county committee to permit an extension of time in individual cases wherein the farmer had been unable to destroy within the previous deadline on account of flooding or excessive moisture. This change in the regulations was issued in Washington on June 20 and sent by the Washington office to the State Committee and thence to the county committee, where it arrived on or about June 26 or June 27.

20. At the meeting held in the county ASC office at Byers on June 28, there were present Mr. Hollingsworth and other members of the county committee, Mr. Cronk, and Mr. Moody, the office manager. Since Mr. Cronk had expressed an interest in obtaining an extension of time within which to destroy his excess acreage of wheat, this new authorization contained in Colorado Letter 8 was read to him. The terms of this letter are as follows:

"Inquiry has been made by several counties with reference to utilizing wheat cover crop within established dates as published in the 1957 Wheat Marketing Quota Regulations, Section 728.751(r), when it has not been possible to dispose of such crop within such dates due to flooding or excessive rainfall conditions.

"The following amendment to Section 728.751(r) appears in the Federal Register of June 20, 1957.

"'2. Section 728.751(r) is further amended by adding the following sentence immediately following the dates established for disposing of excess wheat in all other States in the commercial wheat area: (This includes Colorado) "If a producer proves to the satisfaction of the county committee that he was unable to dispose of the excess wheat acreage prior to the original disposal date because of the physical condition of the wheat areage due to flooding or excessive rainfall, an extension of time sufficient to afford a fair and reasonable opportunity for such disposal may be granted by the county committee, providing the excess acreage is destroyed by flooding, excessive rainfall or by mechanical means to the extent that it cannot be harvested for grain or used for hay or silage. Such acreage must be disposed of prior to the date established by the county committee in each case in which an extension is granted."'

"County committees will be guided by this instruction. The amendment to the regulations will be issued at a later date."

Mr. Cronk did not ask the county committee for an extension of time to afford him additional opportunity to destroy his excess acres and the county committee did not volunteer an extension.

21. At this meeting, however, there was discussed the possibility of reaching a settlement of the penalty for harvesting excess acres under the Acreage Reserve agreement. The contract and the Terms and Conditions incorporated therein, in Sections 3(b) and 13, provide for a civil penalty of 50 per cent of the compensation provided for in the contract in the event the excess acres are harvested. The amount of the civil penalty is also stated in paragraph 14 on the face of the Acreage Reserve agreement. With this in mind, I believe that Mr. Cronk decided either before he went to the meeting, or during the meeting, that he was going to harvest the crop, and he desired to make some sort of arrangement with the county committee whereby he could harvest all the excess acres and not pay the full amount of the penalty called for by the terms of the contract.

22. As a result of this meeting the following statement was incorporated into a so-called "Compliance Report":

"—Acreage Reserve program, Form CSS–831 (plaintiff's Exhibit 2):

"One landlord, B. Emmet Bohan, did not want Roland Cronk to destroy excess wheat. Due to tenant's (meaning Cronk) financial condition lending agency wanted wheat harvested. Also due to excessive wet weather wheat could not be destroyed by June 10, 1957."

In this report also it was indicated in Section B thereof that the violation involved was as follows: "Not destroyed by June 10, 1957." In Section D thereof it was shown that both Emmet Bohan and Roland Cronk had forfeited the right to their compensation. In the column showing compensation "to be paid," opposite their names there were written, so far as Mr. Bohan and Mr. Cronk were concerned, the words "none." Under the "civil penalty" column, opposite the names of Bohan and Cronk, respectively, in Section D of the form, captioned "Compensation," there was entered a civil penalty for Bohan of $163.21, or one-half of his payment, and after the name of Cronk in the same column the figure $6,258.45, or half of his compensation. In the last column, entitled "total to be recovered," opposite Mr. Cronk's name appeared the figure $4,258.45. Beneath this section, in Section E, entitled "Agreement of Producers," it was stated in substance that the undersigned agreed to pay the amount of civil penalty shown above, and it was further stated that the agreement was subject to disapproval by the State Committee "by written notice to the undersigned within 90 days after the date of signature of the last producer to sign this agreement." The only producer who signed this form was Roland K. Cronk, under date of June 28, 1957. Below this section, in Section F of the form, the facts developed and county committee's recommendations appear. There also appears in this statement the following phraseology: "Because of these extenuating circumstances the County Committee and Roland K. Cronk have agreed to settle for $4,258.45." Other statements appear in this section about which there was no testimony, and they are not material. The form was signed on behalf of the county committee by the authorized county committeeman, Joseph K. Turecek.

23. This so-called Compliance Report form was apparently sent promptly to the State ASC office in Denver. It appeared on the face of the form that only one of the three producers had signed the proposed compromise offer. Moreover, it was not stated on the face of the report that Mr. Cronk had harvested any excess acres, nor indeed that he had harvested any acreage. Mr. Cronk testified that he did not begin his harvest

until July 19, 1957. He had a right to harvest 713.5 acres, or his so-called permitted acres, without being subject to any harvesting penalty. The State ASC office did not reply to this offer until almost the expiration of the 90-day period, that is on September 16, 1957 (plaintiff's Exhibit 2). It would have been reasonable for the State ASC Committee to have written Mr. Cronk at least by the time it knew that harvesting operations had been begun in the area, either accepting or rejecting the proposal, although it did respond within the maximum 90 days allowed for a decision. Mr. Cronk would probably have harvested all of his excess acres even if he had promptly received a notice that his compromise proposal to settle the harvesting penalty for $4,258.45 (rather than the full amount) had been rejected.

24. Evidence was introduced by Mr. Cronk tending to show that if he had complied with the contracts he would have been better off financially than he was as a result of his noncompliance. The parties stipulated concerning the total production of wheat, the amount placed in storage to avoid the payment of penalty under the Wheat Marketing Quota Program, and the amount received for the wheat sold. It was Mr. Cronk's contention that if he had complied with the contract and destroyed all but 713.5 acres he would have had an average yield on this acreage of 25 bushels per acre. The normal yield for the farm, according to the MQ–93 (plaintiff's Exhibit 27), issued under the Marketing Quota Program, was 17 bushels. The average yield under the stipulation for the entire farm, including Mr. Bohan's and Mrs. Black's very small acreage of wheat, was 18.87 bushels per acre. Mr. Cronk testified that had he complied with the contract he would have received $2 per pushel for the wheat, which was higher than the average price for the wheat that was actually sold. Mr. Cronk also testified concerning the acreage planted to wheat on each tract and the yields thereon, as shown on Government Exhibit F. The only tract on which he stated he had

a yield of 25 bushels was the acreage seeded on Section 36 in Weld County, on which he seeded 300 acres. Mr. Bohan, who had one of the "best yields" on the entire farm, had a yield of 20 bushels to the acre. Counsel for the Government disputed Mr. Cronk's calculations in a discussion during the closing argument. For reasons stated hereinbefore and in the Conclusions, I find no need to decide as a fact whether Mr. Cronk would have been better off financially to have complied or not to have complied with the contract.

## Discussion and Conclusions of Law

This case arose as a result of a complaint filed by Roland K. Cronk against Ezra Taft Benson, Secretary of Agriculture, and the State and county ASC committees, under the so-called Soil Bank Program (7 U.S.C.A. § 1801 et seq.). Under this statute and the regulations issued by the Secretary, a producer is given the right, after prior administrative proceedings have been held, to seek judicial review by trial de novo of a final determination of the State Committee with the objective of setting it aside (7 U.S.C.A. § 1831(d)). The State ASC Committee in this case issued a final determination on Form CSS–843 in which it determined that the plaintiff should forfeit all of his payment under the contract and in addition was liable for the payment of $7,095.76 for having "knowingly and willfully" violated his Acreage Reserve agreement by harvesting excess acreage. The Government filed a counterclaim seeking damages for violation of the contract in the amount of $7,095.76 plus interest at 6 per cent per annum from December 12, 1957, when the final determination of the State Committee was made, and costs. In this connection, counsel for both parties agree that Mr. Cronk received the appropriate notices to appear at the county and at the State level, under the administrative violations procedure for relief through administrative channels. There is no question but that the plaintiff exhausted his administrative remedies.

He also filed his appeal within the 90-day period allowed by the Statute and regulations. This Court has jurisdiction over the subject matter of this action and over the parties.

The complaint states six claims.

The major question, raised in the first claim, is whether the admitted harvesting of the excess acreage by plaintiff was knowing and willful. The position of the plaintiff that it was not, was based largely on two contentions: (a) that the weather was too wet to permit the plaintiff to get into the fields to destroy the crop prior to the destruction date established under the regulations; and (b) that plaintiff's position was prejudiced by the delay on the part of the State ASC Committee in rejecting or accepting the compromise proposal to settle the harvesting penalty which he submitted at the meeting of the county committee on June 28.

At the outset, the question was raised concerning which party had the burden of proof. I have concluded that the burden of proof on the issues raised in the first cause of action is upon the plaintiff. Baltensperger v. United States, D.C.D.Neb.1959, 174 F.Supp. 601. That is, the plaintiff must show by a preponderance of the evidence that he did not "knowingly and willfully" harvest the excess acres. However, were the burden of proof upon the Government to prove to the contrary, I believe the preponderance of the evidence would support and does support the Government in this contention.

I believe that "willfully", as used in the statute, means conduct marked by careless or wanton disregard of whether or not one has the right so to act. It also means an act done by one who either intentionally disregards the statute or is plainly indifferent to its requirements, United States v. Illinois Cent. R. Co., 1938, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773.

My conclusions on this and related issues have been stated in my oral opinion delivered from the bench, which I hereby adopt as part of these written conclusions, as follows:

"The Court: I believe and so find that on and prior to June 10, 1957, the plaintiff Cronk had determined not to destroy the excess acreage.

"I think that the evidence leaves no choice but to determine that, beginning as early as March, through April and May, both before and after the soil conservation contract was entered into, Mr. Cronk had considerable uncertainty in his own mind as to what would be to his advantage and that the variables which caused the uncertainty were, of course, crop conditions and the weather, other elements affecting crop production, which could not be known except as time went on.

"I believe from the evidence that that uncertainty as it was resolved was resolved in favor of nondestruction progressively through May. There was, unlike previous years, some substantial moisture in May, at least during the latter part, although it wasn't excessive, and the crops continued to develop.

"I find it hard to believe that if plaintiff was unwilling to come to a decision on the destruction of crops and wished to sit in by increasing his acreage during the early part of the season that as the crop successfully began to develop and mature he would be any less hopeful concerning the development of these crops.

"These practical matters aren't completely white or black. It's hard to envisage an absolute determination and resolve, no matter what happened, not to destroy the excess acreage. We know how those situations come about in human affairs. We hope against hope, and we think we'll wait for a little while longer; and when the situation developed into June, where if some determined effort had been made the crop still may have been substantially destroyed to the extent of the excess acreage, it was hardly consistent with the type of man that Mr. Cronk was, if he could see his way

at all to mature those crops, to destroy them.

"When June 10 came around he thought, I believe, that the die had been cast, no matter what the uncertainty was before that time; and I'm convinced that there was a violation of the requirement for the destruction on or before June 10 which was with knowledge of the consequences and which the plaintiff willfully accomplished by his hopefulness that the crops would so develop as to make it profitable for him, or without the consequence of any substantial loss.

"That isn't to say that compliance may not have been difficult. I don't think the law contemplates that one can excuse noncompliance by saying that it would be inconvenient, that 'I would have to hire an additional man or additional equipment.' Those might be considerations leading to the exercise of a discretion with regard to the granting of an extension, but one cannot say that compliance is not willful merely because it would have required the effort of starting in early enough to reasonably accomplish the work.

"If there had been a postponement against the hope that I've suggested, up until June 1, and leaving enough time before June 10 with diligent effort to have destroyed the excess acreage, and then the weather had set in to make impossible the accomplishment of that work, there may have been some reasonable plea that the failure was not intentional; but we don't have that situation. We have a weather situation which I believe under all of the evidence, indicates that if there had been a desire to destroy the crops that could have been implemented and accomplished prior to June 10.

"I think it also is perhaps worthy of note that the real gist of the problem before me isn't whether there was a willful and knowing failure within the first period to accomplish the destruction. After all, the gist of the charge which is most significant here is whether there was a willful and knowing harvesting of the crops contrary to the regulations.

"I believe the evidence indicates that Mr. Cronk was asked to come into the meeting of June 28 and that he did so in response to a request. (I do not) mean to say that he wasn't concerned with the problem of violation and that he was not interested in any possibility that would give him more time to make a determination of what the prospects would be.

"I think at the meeting he knew that an extension could be granted, and most probably would be granted if he had requested it; but we have to appraise that situation in view of the actuality there that between the 28th of June and the anticipated time of harvesting an extension would not have been of any great value unless he was in a position at that particular time and of a state of mind to begin the destruction of his excess acreage.

"There is nothing in the evidence from which the Court could find that as of June 28 he had determined in his own mind if he could get an extension to destroy the excess acreage. I believe the contrary appears; that if he were uncertain before about it, he would have been as equally uncertain as to whether he wanted to destroy it as of June 28, and perhaps, a little more sure as of June 28 that he did not desire to destroy the crops.

"We have heard discussion and evidence with regard to whether it would have been advantageous for him to have obtained an extension and to have destroyed the excess acreage. I must recognize that perhaps any good husbandlike farmer as between two choices, each involving no great consequence otherwise, would choose nondestruction in preference to destruction. That's natural. But as of the 28th, no matter what the crops turned out to be in July, those crops were merely an estimate. From the little experience that most of us have had on farms in this area and from common knowledge we know that the estimation of a land yield isn't an exact mathematical computation; and sometimes either our pessimism or our opti-

mism affects judgment. It's all right now to look back and calculate the exact yield and say a particular course of action would have been desirable or undesirable; but as of the 28th there wasn't any positive way to determine what the yield would be, although various people could make estimates, with general, though not specific, validity.

"If there had been anything in the evidence to show any statement that Mr. Cronk even claimed that as of the 28th he wanted an extension for the purpose of destroying his crops, my view would have been different. I have been unable to find any indication, either express or implied, that Mr. Cronk's state of mind as of the 28th of June, 1957, was that he wanted an extension so that he could come into compliance. The most that can be said is that he wanted to negotiate to see if he could work out a deal whereby he could harvest his crops. There is nothing to suggest (anything more), and I waited and listened in vain for Mr. Cronk to say, that 'If I hadn't thought that the settlement would have gone through, I would have destroyed the excess acreage in preference to subjecting myself to the full penalty.'

"But he was willing to go ahead and harvest his crops by paying a $4,000 penalty. There's nothing to suggest in the evidence that he wouldn't have elected to go ahead and harvest his crops, even though he knew that there would be the liability for another $3,000 payment as a consequence. As a matter of fact, if we place ourselves in the position of Mr. Cronk at that time, his estimates couldn't have been so close as to have excluded the possibility that there could have been variation amounting to about $3,000 in the actual production of the land and the anticipated or estimated production at that time.

"Again, if I had had some evidence, could have found something in the record, which would have permitted me to find that as of June 28 that Mr. Cronk was of the state of mind that if this proposed compromise hadn't been approved he would have desired to have an extension for the purpose of forthwith going about to destroy the excess acreage, my view of the case would have been different; but I'm sure that both Mr. Cronk and counsel have been very forthright, very fair, although very vigorous, in presenting the evidence and would not have overlooked that if that were the fact.

"The most troublesome thing to me in this case has been the question of whether an estoppel should operate as against the Government. Frankly, I don't appreciate at all the evidence in this case that the state committee had forwarded to it as of, presumably, about the 28th of June, or shortly thereafter, this compromise settlement without taking action on it until September, after they must have known that the die had been irrevocably cast as far as harvesting of the crops were concerned; because Mr. Cronk had no other choice under the circumstances than to harvest them. As I say, on his side, I can't find any basis for finding that he would have done otherwise, whether the compromise had been agreed upon or not; but to have the state committee sit on such a thing until September under those circumstances would lead me to invoke an estoppel if I thought one could legally be invoked to the extent of any excess between the four thousand some odd dollars—the $4,258.45—and the some seven thousand dollars which is claimed by the Government here.

■ "The general rule seems to be that an estoppel cannot be invoked against the Government. There are some exceptions in modern authority, but all of those exceptions are qualified by certain conditions, among which are that an estoppel will not be invoked when it would recognize an illegal act. It will not be invoked when it would recognize the act of an agent beyond that agent's authority. And it will not be recognized, of course, if the basic elements of an estoppel are not present; that is, that one seeking to invoke the estoppel has changed his position in reliance upon some appearance or representation or situa-

tion created by the one against whom the estoppel is claimed.

 "I'm not convinced as a matter of law that the county committee had the right to waive the harvesting penalty, there being a knowing violation on the basis of a considered risk on the part of the defendant. I'm not convinced that such a waiver would be legal even on the part of the state committee. Those propositions of law are somewhat debatable.

"But I am convinced that the question is rather definitely resolved by my belief that Mr. Cronk did not change his position in reliance upon this purported understanding. If he did change his position, contrary to my belief and finding, he did it with full recognition of the possibility that the state committee would either approve or disapprove the settlement. He did it under circumstances which again didn't indicate that his intention was at all after June 28 to do anything other than harvest the wheat.

"I think that a finding that if he had learned that the settlement had been disapproved he would not have harvested the wheat would not be supported by the preponderance of the evidence or even any substantial evidence. Mr. Cronk himself in what I regard as testimony reflecting the facts to his best advantage, but honestly and candidly as he saw them, didn't even claim that.

"I think, therefore, the conclusion follows that the plaintiff must fail in his complaint upon the facts; that the defendant must succeed upon its counterclaim. * * *

"Judgment may be entered as indicated. No costs to be allowed."

The foregoing disposes of the first and fourth claims in the complaint, the latter of which is based on a claim of estoppel.

 In the second claim the plaintiff contends that the contract is void for failure of consideration. This contention is without merit. The contract calls for the doing of acts by the plaintiff in return for a cash consideration from the Secretary of Agriculture.

The fifth claim has to do with the alleged refusal of the county committee to reconstitute the land of Edna Black as a separate unit. This claim was advanced as a reason why the release of Mrs. Black should be deemed a discharge of plaintiff from liability for the penalty in question, which claim I find not meritorious as a matter of law under the facts found.

The sixth claim is dismissed because the amount of the civil penalty conforms with the Regulations issued by the Secretary of Agriculture under the statute which are a necessary and proper implementation of the plan thereof.

The third claim challenges the constitutionality of the Act, but in relation to the facts in this case I conclude that the act is constitutional.

Judgment may be entered as indicated. No costs to be allowed.