Glen H. SHAY et ux., Appellants,

v.

AGRICULTURAL STABILIZATION AND CONSERVATION STATE COMMITTEE FOR ARIZONA et al., Appellees.

No. 17236.

United States Court of Appeals Ninth Circuit.

Jan. 24, 1962.

Walter Roche of Kramer, Roche, Burch & Streich, R. J. Ellis of Rawlins, Davis, Ellis, Burrus & Kiewit, Phœnix, Ariz., for appellants.

William H. Orrick, Jr., Asst. Atty. Gen., Alan S. Rosenthal and Marvin S. Shapiro, Dept. of Justice, Washington, D. C., C. A. Muecke, U. S. Atty., Phœnix, Ariz., for appellees.

Before JERTBERG, MERRILL and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Before us are an appeal from a final judgment of September 20, 1956, an appeal from an order of March 14, 1961 overruling a motion to vacate a post-judgment order of December 30, 1960, and a motion to dismiss that appeal. We conclude: (1) that the judgment must be reversed; (2) that the motion must be denied; (3) that the order must be reversed.

The action arises under the Soil Bank Act of 1956 (called "the Act", 70 Stat. 188, 7 U.S.C.A. § 1801 ff). The court below had jurisdiction under § 107(d) (7 U.S.C.A. § 1831(d)). We have jurisdiction under 28 U.S.C. § 1291.

1. *The judgment must be reversed.*

Shay and wife, plaintiffs below and appellants here (called "plaintiffs") brought this action to review the determination of the appellee, Agricultural Stabilization and Conservation State Committee for Arizona, and its members, sued as such (called "defendant" or "the Committee") that, for reasons hereafter discussed, the plaintiffs must refund $66,549.60, the entire payment theretofore received by them under a soil bank contract. The judgment affirmed the determination of the committee.

a. The Facts

The basic facts are undisputed. Plaintiffs, on March 26, 1957, entered into a "Soil Bank 1957 Acreage Reserve Agreement" with the Secretary of Agriculture. The agreement is embodied in a printed government form. It is a perfect example of a so-called "contract of adhesion"—one which gave the plaintiffs but one choice—to adhere to it or to reject it. (See Kessler, "Contracts of Adhesion—Some Thoughts About Freedom of Contract", 43 Col.L.Rev. 629; Patterson, "The Delivery of a Life Insurance Policy," 33 Harv.L.Rev. 198, 222). The lands involved are 421.2 acres, 300 of which are in the N ½ of Section 13 and the balance, 121.2 acres, parts of two parcels, one of 100 acres in the NW ¼ and one of 60 acres in the SE ¼ of Section 19, all in Pinal County, Arizona.

The three parcels are not contiguous. The lands had been used for cotton growing. Under the contract, they were "withdrawn from production" of that commodity. A certificate for $66,549.60 was issued to the plaintiffs under the agreement and cashed by them.

In the contract, under "Part IV—PRODUCERS' CERTIFICATIONS", there appears, in bold-faced type: "The producers will be subject to a civil penalty as specified in Part IX, Section 'D', if they knowingly and willfully graze or harvest any crop in violation of this agreement." "PART IX—TERMS AND CONDITIONS" contains three columns of fine print covering the whole of the back of the form. We quote only the pertinent portions:

"A. AGREEMENT SUBJECT TO REGULATIONS.

"(1) Each * * * owner * * * (hereinafter called the 'producer') whose signature appears on the front hereof * * * fully understands that this agreement is subject to all of the provisions of the regulations issued by the Secretary governing the 1957 acreage reserve program. (Such regulations * * * are hereby made a part of this agreement * * *. Copies of such [r]egulations are available at the office of the county committee.) * * *.

"B. USE OF ACREAGE RESERVE * * *

"(2) *Harvesting and grazing prohibited.*
No crop shall be harvested from the acreage reserve * * * prior to January 1, 1958, and the acreage reserve shall not be grazed * * * before January 1, 1958, unless the Secretary gives written consent to such grazing * * *.

"(3) *Planting restricted.* No crop shall be planted on the acreage reserve * * * prior to January 1, 1958, except (i) crops planted in the fall of 1957 for harvest in 1958 or a later year * * *.

\*   \*   \*   \*   \*   \*

"D. CIVIL PENALTY. If the producer (i) knowingly and wilfully grazes or harvests any crop from the acreage reserve in violation of this agreement, * * *, he shall be subject to the civil penalty of 50 per centum of the compensation payable * * * imposed by section 123 of the Soil Bank Act. Such penalty shall be in addition to any amount required to be forfeited or refunded under section 'L' of this Part IX.

\*   \*   \*   \*   \*   \*

"L. VIOLATIONS.

"(1) If the Secretary determines that there has been a violation of this agreement and that such violation is of such a substantial nature as to warrant termination of this agreement, the producer agrees that all rights to compensation hereunder shall be forfeited, and agrees to refund to the United States all compensation received by him or by any tenant or sharecropper hereunder.

"(2) If the Secretary determines that there has been a violation of this agreement but that such violation is of such a nature as not to warrant termination of this agreement, the producer agrees to accept such adjustments in compensation, to forfeit such benefits, and to make such refunds to the United States of compensation received by him or by any tenant or sharecropper hereunder as the Secretary may determine to be appropriate.

"(3) * * * if a refund of less than the face amount of the certificate is required, the producer agrees to make a cash refund to the United States, plus interest at the rate of 6 percent per annum.

"(4) The determination as to whether a violation has occurred, and whether such violation is of such a substantial nature as to warrant termination of this agreement, and the amount of any adjustment, forfeiture, or refund, shall be made

in accordance with regulations issued by the Secretary. * * * "

The foregoing is only a small part of the fine print embodied in Part IX.

It is conceded that until December 12, 1957, plaintiffs fully complied with the agreement. On that day they put 150 head of weaner calves on the 60-acre parcel in Section 19, and kept them there 14 days, expressly for the purpose of grazing the land. On the same day, they placed 150 head of cattle on the 100-acre parcel in Section 19, and kept them there until January 1, again expressly for the purpose of grazing the land. There was no violation at any time as to the 300 acres in Section 13.

The background of plaintiffs' otherwise rather surprising action explains, if it does not legally justify, what they did. In early October, 1957, they "dry planted" the lands in section 19 to barley, expecting that, by reason of the normally arid climate, no rains would come in October, and the seed would not germinate until late in the year. Under this program, the crop would not be sufficiently advanced to be damaged by the frosts that usually occur in January and February, and it would be harvested later in 1958. This would comply with the provisions of Part IX, B, (3)(i) of the agreement, quoted above. The method of planting used is customary in the area. As it turned out, October, 1957 was one of the wettest on record in that area, the crop came up early, and it was in such condition by December, that, if not mown or grazed, it could be lost by being frost-killed in January or February. It was for the purpose of saving the crop that plaintiffs, in December, put the cattle on the lands in question. They did not need to do so to feed the cattle; they had not expected to graze the cattle until after the first of the year, and had plenty of hay and other feed on hand to carry them until then. No effort was made to obtain the Secretary's permission to graze.

The court found that plaintiffs knew, when they placed the cattle on the acreage reserve lands, that their doing so was in violation of the agreement. In this it was clearly correct. They claim that they were forced to do so by an Act of God. Not so. The unprecedentedly heavy rain may well have been an Act of God, but it was not a legal cause of what plaintiffs did. The grazing of the lands was an act of the plaintiffs, voluntarily done by them to save themselves from a probable economic loss, the amount of which, according to the evidence, would not exceed $6,000, and probably would be less. The value to them of the grazing that occurred was stipulated to be $648. As plaintiff Glen Shay testified: "that [the grazing] was my cheapest and easiest way out of it * * * " Such voluntary action, in admitted and knowing violation of a contract, taken solely to save money, in no way resembles the unpreventable action of the elements, unforeseen and usually unforseeable, that may be a defense under the convenient rubric of "Act of God". It is not clear from plaintiffs' briefs whether they are urging "Act of God" as a direct cause of whatever breach there was, or as a species of impossibility of performance, excusing breach. But it makes no difference which contention is made. Plaintiffs still could have performed, but chose not to do so because performance would probably have cost them some money. (cf. Cronk v. Benson, D.C.Colo. 1960, 187 F.Supp. 4)

The court also found that plaintiffs' act was done "knowingly and wilfully". It did not find as a fact, but did conclude as a matter of law, that the knowing and wilful grazing was "a violation of such substantial nature as to warrant termination of [the] Agreement . ." and that the "nature of the * * * violation was such as to defeat or substantially impair the purposes of the contract."

The Committee, whose determination was being reviewed by the court (see §§ 103 and 107(d) of the Act, 7 U.S.C.A. §§ 1821 and 1831(d)), determined that the lands were knowingly and wilfully grazed, and that the entire payment made

to plaintiffs should be refunded. But it did not "determine" that the violation was "of such a substantial nature as to warrant termination of the contract".

The Committee also purported to determine that the plaintiffs are liable for a civil penalty of fifty percent of the compensation paid them ($33,274.80). (See Part IX, D, of the agreement, quoted above, and § 123 of the Act, 7 U.S.C.A. § 1811). A separate action has been brought by the United States to recover this penalty and was still pending when this action was tried. The court made no findings on this subject.

#### b. The Statute

The contract was made pursuant to § 103 of the Act (7 U.S.C.A. § 1821.) The pertinent portions are:

(a) * * * To be eligible for such compensation, the producer * * * (3) shall not harvest any crop from, or graze, the reserve acreage unless the Secretary, after certification by the Governor of the State * * * of the need for grazing on such acreage, determines that it is necessary to permit grazing thereon in order to alleviate damage, hardship, or suffering caused by severe * * * flood, or other natural disaster, and consents to such grazing. * * * The * * * program may include such terms and conditions, in addition to those specifically provided for herein * * * as the Secretary determines are desirable to effectuate the purposes of this chapter and to facilitate the practical administration of the * * * program.

" * * * the producer * * * must first enter into a contract * * * which * * * in addition to such other terms and conditions as may be prescribed by the Secretary, shall contain provisions by which such producer shall agree:

"(i) In the event that the Secretary determines that there has been a violation of the contract at any stage during the time such producer has control of the farm and that such violation is of such a substantial nature as to warrant termination of the contract, to forfeit all rights to payments or grants under the contract, and to refund to the United States all payments and grants received by him thereunder: *Provided, however,* That the provisions of section 1831(d) of this title shall apply to the termination of any contract hereunder.

"(ii) In the event that the Secretary determines that there has been a violation of the contract but that such violation is of such a nature as not to warrant termination of the contract, to accept such payment adjustments, forfeit such benefits, and make such refunds to the United States of payments and benefits received by him, under the contract, as the Secretary may determine to be appropriate."

Section 107(d) (7 U.S.C.A. § 1831(d), referred to in § 1821(a)(i) above) provides:

"(d) A contract shall not be terminated under paragraph (6) of subsection (a) of this section unless the nature of the violation is such as to defeat or substantially impair the purposes of the contract."

The section sets up a procedure to determine whether the contract should be terminated, by an informal hearing before the County Committee (see Section 117 of the Act, 7 U.S.C.A. § 1805, and 16 U.S.C.A. § 590h), another hearing before the State Committee, and judicial review by a United States District Court—the procedure followed here. The procedure is authorized "[w]henever the State Committee believes that there has been a violation which would warrant termination of a contract", and the producer is given "an opportunity to show cause * * * why the contract should not be terminated". After a hearing before the County Committee, the

State Committee is to make a "determination * * * as to whether there has been a violation which would warrant termination of the contract". "* * * [T]he producer * * * may obtain judicial review of such determination by filing a complaint * * * requesting the court to set aside such determination. * * * The action * * * shall be a trial de novo to determine whether there has been a violation which would warrant termination of the contract."

Section 123 of the Act (7 U.S.C.A. § 1811) provides:

"Any producer who knowingly and willfully grazes or harvests any crop from any acreage in violation of a contract entered into under section 1821 or 1831 of this title shall be subject to a civil penalty equal to 50 percentum of the compensation payable for compliance with such contract for the year in which the violation occurs. Such penalty shall be in addition to any amounts required to be forfeited or refunded under the provisions of such contract, and shall be recoverable in a civil suit brought in the name of the United States".

It will be observed that paragraph D of Part IX of the agreement is an accurate paraphrase of this provision, and that paragraph L(1) and (2) of Part IX is an accurate paraphrase of the substantive parts of paragraphs (i) and (ii) of subparagraph (a) of 7 U.S.C.A. § 1821, quoted above, but omits reference to court review.

### c. The Regulations

Section 124 of the Act (7 U.S.C.A. § 1812) reads:

"The Secretary shall prescribe such regulations as he determines necessary to carry out the provisions of this chapter".

Elaborate regulations were adopted pursuant to this section. The portion material here is § 485.286, (6 C.F.R. § 485.286) which reads, in part:

"*Grazing the acreage reserve.* Where the acreage reserve is grazed in violation of an Acreage Reserve Agreement, the amount of the forfeiture or refund shall be as specified below in this section.

"(a) If the acreage reserve is knowingly and willfully grazed * * * the entire amount payable or paid to the operator shall be forfeited or refunded. * * *

"(b) If the acreage reserve is grazed as the result of gross negligence * * * compensation shall be forfeited or refunded to the same extent and in the same manner as prescribed in paragraph (a) of this section for knowingly and willfully grazing the acreage reserve.

"(c) If the acreage reserve is grazed * * * under circumstances other than those specified in paragraph (a) or (b) of this section, compensation shall be forfeited or refunded in an amount equal to the value of the grazing as determined by the county committee".

It is at once apparent that the provisions of the regulation are not a paraphrase of paragraphs (i) and (ii) of subparagraph (a) of 7 U.S.C.A. § 1821, quoted above. They purport to make any knowing and willful or grossly negligent grazing a basis for forfeiting or refunding the entire compensation, whereas the statute conditions such forfeiture upon a determination that there has been a violation which is of such a substantial nature as to warrant termination of the contract.

### d. The judgment is erroneous.

We think that the provisions of § 1821, especially when construed with subparagraph (d) of § 1831, which is expressly made applicable, and which forbids forfeiture unless there be a violation of the prescribed character, clearly establishes two conditions to forfeiture. One is that there must be a determination that there has been a particular violation of a specific contract. Here,

such a determination has been correctly made. The other is that that particular violation is of such a substantial nature as to warrant termination of that particular contract (§ 1821) or its nature is such as to defeat or substantially impair the purpose of the particular contract. (§ 1831(d)). The latter test is a refinement of the former.

The regulation, on the other hand, attempts to categorize, in advance, every willful and knowing or grossly negligent violation as having the required nature. The proposition is so easily reducible to an absurdity as to be clearly untenable. Suppose, for example, that the plaintiffs had deliberately permitted one calf to graze on one quarter acre for 10 minutes, knowing that this violated the contract. (cf. United States v. Maxwell, 8 Cir., 1960, 278 F.2d 206, 212; White v. United States, W.D.C.Tenn., 1959, 183 F.Supp. 591, 593; Ludvigson v. United States, N.D.C.Iowa 1961, 190 F.Supp. 942). The Congress, when it adopted sections 1821 and 1831, clearly intended that each case be determined on its own merits, with reference to the statutory standard.

■■ We are therefore of the opinion, and we hold, that § 485.286 of the regulations is invalid, because it conflicts with, rather than carries out, the provisions of the Act. We do not think that the Secretary, by purportedly incorporating his regulations, by reference, into the contract, can make this regulation valid as part of the contract, when it is invalid as a regulation. To permit any such result, in a contract of adhesion of this type, when the plaintiffs' only real alternatives were to sign it as printed or stay out of the program, would be to punch a hole as wide as a barn door in the restrictions imposed by the Congress upon the authority of the Secretary. (cf. United States v. Maxwell, 8 Cir., 1960, 278 F.2d 206, 210–211) So far as appears from the opinions, the validity of the regulation was not considered, but was assumed, in Goering v. United States, D.C.Iowa 1960, 183 F. Supp. 170, and Baltensperger v. United States, D.C.Neb., 1959, 174 F.Supp. 601. There is nothing contrary to the views here expressed in our decision in United States v. Arakelian, 1960, 282 F.2d 760.[1]

The question of the validity of the regulation is squarely presented by this record. The Secretary furnished to the committee a "County Acreage Reserve Handbook" which contains "Part 5. Violation Provisions". This handbook instructs the committee in "step 94", to apply the test of the regulation, and does so with some emphasis: "It will be noted that the farm operator is always required to forfeit or refund all payment in the case of a knowing and willful violation involving grazing or harvesting a crop from the reserve acreage or harvesting excess acreage. It will also be noted that the amount of forfeiture or refund is the full amount of payment." The committee, as we have seen, made its "determination" using the test of the regulations, not the statutory test. The Court did the same thing, apparently believing that the regulation was valid and binding upon it. We see no other explanation of the fact that its fact-finding is solely in the terms of "knowingly and wilfully", while only its legal conclusion uses the statutory language.

■ It is not our function to determine whether the particular violation here involved was in fact of such a substantial nature as to warrant termination of the contract—whether its nature is such as to defeat or substantially impair the purposes of the contract. That was the duty, first, of the committee, and,

---

1. If the Secretary had adopted regulations that spelled out a definition of types of violation that are of such a substantial nature as to warrant termination of a contract—or to defeat or substantially impair its purpose—in a manner rationally consistent with the statute, or indicating matters to be considered in making a determination upon the subject, a different question would be presented. We are not holding that he cannot do so. We deal only with the regulation that is before us.

second, of the trial court. Since this duty was not performed, the judgment is erroneous.

The determination of the committee, and the judgment of the court, are erroneous in another respect. The committee purported to determine that plaintiffs are liable for an additional civil penalty, of fifty percent of the payments received, and the court affirmed, although it made no findings on this question. The question as to whether the violation was knowing and willful is central with reference to the imposition of the separate penalty prescribed by section 123 of the Act. (7 U.S.C.A. § 1811). With that penalty neither the Secretary, the committee, nor the court below had anything to do. (United States v. Maxwell, 8 Cir., 278 F.2d 206, 208) Congress has committed the imposition of the penalty solely to the judgment of a court, "in a civil suit brought in the name of the United States". Such a suit is pending, and it is there that liability, if any, for the penalty must be determined.

The jurisdiction of the court below—and therefore of this court on appeal—is strictly limited. It has jurisdiction solely to "review" a determination that there has been a violation which "would warrant a termination of the contract" (7 U.S.C.A. §§ 1821, 1831(d); see United States v. Maxwell, 8 Cir., 278 F.2d 206, 213; Inman v. United States, S.D.C.Tex., 1959, 172 F.Supp. 841; Holden v. United States, E.D.C.Ark., 1960, 187 F.Supp. 790, 794–5; Dickson v. Edwards, C.A. 5, 1961, 293 F.2d 211; Caulfield v. United States Dept. of Agriculture, C.A. 5, 1961, 293 F.2d 217; Reimann v. United States, D.C., Idaho, 1961, 196 F.Supp. 134, 138.) We do not pass upon the question as to whether the civil penalty, prescribed by § 123 of the Act (7 U.S.C.A. § 1811) may be recovered in a case where the violation does not warrant a termination of the contract, because that question is not before us. (cf. White v. United States, W.D.C.Tenn., 1959, 183 F.Supp. 591; Maxwell v. Benson, N.D.C.Iowa, 1959, 173 F.Supp. 75, 82 aff'd. in part, United States v. Maxwell, 8 Cir., 1960, 278 F.2d 206; Reimann v. United States, D.C.Idaho, 1961, 196 F.Supp. 134; United States v. Gossett, W.D.C.Ark., 1961, 194 F.Supp. 703)

While it is true that the hearing below was "a trial de novo", it is also true that its purpose, as stated in the statute, is to "review" a determination of the committee. Only in doing so, is the court to "determine whether there has been a violation * * * of the contract". (7 U.S.C.A. § 1831(d)) But this it does as part of a process of review of the committee's determination. As we have seen, the committee itself did not make such a determination. Under the circumstances, we think that the matter should go back to the committee. It did determine that there was a violation, and that determination is clearly correct. It should be instructed to determine only one further matter—whether that violation is of such a substantial nature as to warrant termination of the contract—as to defeat or impair the purposes of the contract. The issue as to whether the violation was knowing and willful is peripheral here. Plaintiffs' state of mind at the time of breach would be material only as one fact to be considered, along with others, in making the determination required. (cf. Inman v. United States, D.C.Tex., 1959, 172 F. Supp. 841) If the committee determines that the violation does warrant termination, that determination will be again subject to review by the court below; if it determines that the violation is of such a nature as not to warrant termination, it would appear that such determination would not be subject to review, but would be handled administratively under 7 U.S.C.A. § 1821(a)(ii). (See 7 U.S.C.A. § 1809; United States v. Maxwell, 8 Cir., 278 F.2d 206, 213, affirming in part Maxwell v. Benson, D.C. Iowa, 1959, 173 F.Supp. 75, 81; Holden v. United States, E.D.C.Ark., 1960, 187 F.Supp. 790; Elliott v. United States, D.C.Neb., 173 F.Supp. 758, 761–762).

2. *The motion in this court to dismiss the appeal from the post-judgment order should be denied.*

Judgment was entered on September 30, 1960. On December 30, 1960, plaintiffs obtained an order purporting to stay all proceedings for the enforcement of the judgment, pending appeal, and directing the immediate release of any claim of lien by the Department of Agriculture, based upon the judgment, on the proceeds of certain crops grown by plaintiffs during 1960 and subsequent years. The order was granted apparently ex parte, pursuant to a letter written on December 19, and addressed to the judge at his Chambers in Oklahoma City. On February 14, 1961 counsel for the government moved for an order vacating the order of December 30. That motion was denied on March 14, and it is from the March 14 order that the appeal was taken, on May 11.

■ The motion to dismiss this appeal is based on the contention that the appeal is actually from the order of December 30, and is not timely (F.R.Civ. P. Rule 73, 28 U.S.C. § 2107). Essentially, plaintiffs' position is that, if any order is appealable, the order of December 30 is such an order, and that the motion to vacate was not one of those listed in Rule 73 and, if it was, was not made within the time limited in Rule 73 and the rules (50(b), 52(b) and 59) to which it refers. The order of December 30, however, was not a judgment, and the motion to vacate, being an attack upon jurisdiction, is, in our opinion, authorized by Rule 60(b). Certainly it is preferable, in the case of an ex parte post-judgment order such as this, that the trial court first be given an opportunity to revoke its order, if it lacked jurisdiction to make it, before appeal is taken, and that, if it refuses to do so, the order of refusal be appealable. (See Sleek v. J. C. Penney Co., 3 Cir., 1961, 292 F.2d 256; Jackson v. Heiser, 9 Cir., 1940, 111 F.2d 310, 312; Weilbacher v. J. H. Winchester & Co., 2 Cir., 1952, 197 F.2d 303; Greenspahn v. Joseph E. Seagram & Sons, 2 Cir., 1951, 186 F.2d 616; Cohen v. Beneficial Loan Corp., 1949, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528) The cases on which plaintiffs rely do not involve comparable situations; most of them deal with orders denying motions governed by Rules 50 (b), 52(b) and 59, rather than with motions made under Rule 60(b). Timely motions under Rules 50(b), 52(b) and 59 extend the time to appeal under Rule 73; a motion under Rule 60(b) does not. As we said in *Jackson,* supra, a motion under Rule 60(b) is the institution of "what was, in effect, an independent action or proceeding". (p. 312 of 111 F.2d.)

3. *The motion to vacate should have been granted; the court lacked jurisdiction.*

■ As we have seen, the jurisdiction of the court below was based upon 7 U.S. C.A. § 1831(d), and that jurisdiction is limited to a review "of the determination of the committee". The judgment purported to do no more. It was not a money judgment, and no execution could be issued upon it. The court's jurisdiction was either to affirm or set aside the committee's determination. The proceeding before it was not one to obtain a judgment against the plaintiffs for the moneys they had received (cf United States v. Maxwell, 8 Cir., 278 F.2d 206, 213; Holden v. United States, E.D.C.Ark., 1960, 187 F.Supp. 790, 795). Hence, although plaintiffs provided a stay bond on appeal, no such bond was appropriate. The order purports to require the release of any claim of lien of the Department of Agriculture upon the proceeds of plaintiffs' crops grown in subsequent years. We find nothing in the law upon which this order can be based.

■ The order was made because plaintiffs at the time had coming to them certain price support payments. It is well established that the government can set off its claims against those who assert claims against it. (United States v. Munsey Trust Co., 332 U.S. 234, 239, 67 S.Ct. 1599, 91 L.Ed. 2022; United States v. Isthmian Steamship Co., 359 U.S. 314, 318, 79 S.Ct. 857, 3 L.Ed.2d 845). Like other creditors, it can exercise its right of set-off even though it has not reduced its claim to judgment. Plaintiffs point to no law whereby the government has

surrendered its right in such a case as this. On the contrary, regulations of the Secretary (7 C.F.R. Part 13, issued under the authority of 5 U.S.C.A. § 22), expressly provide for set-off. Nothing in 7 U.S. C.A. § 1831(d) even remotely suggests that the court is empowered to prevent the government from withholding its own funds by way of set-off. This is not to say that if plaintiffs ultimately win this case they will not get their money. We cannot presume that the Secretary would act in so unlawful a manner, and, if he should, plaintiffs will have a remedy (see 15 U.S.C.A. § 714b. (c) and 7 C.F.R. § 13.6). But the government has a right not to pay out its funds to one claiming to be its creditor when it is asserting a bona fide claim against that creditor.

Nor can the order be sustained under Rule 62(c), F.R.Civ.P. This action does not involve an injunction. Rule 62(d) is equally unavailable. No execution on the judgment below is involved.

The judgment is reversed and the trial court is directed to refer the matter to the committee for further proceedings consistent with this opinion, and thereafter to take such further action, if any, as may be appropriate. The motion to dismiss the appeal from the order of March 14, 1961 is denied, and the order is reversed.