942

**Don LUDVIGSON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 1099.**

United States District Court
N. D. Iowa, W. D.

Feb. 8, 1961.

Charles F. Stilwill (of Stilwill & Wilson), Sioux City, Iowa, and Jesse H. Leonard (of Leonard & Branco), Holstein, Iowa, for plaintiff.

F. E. Van Alstine, U. S. Dist. Atty., and William R. Crary, Asst. U. S. Dist. Atty., Sioux City, Iowa, for defendant.

GRAVEN, District Judge.

In this action the plaintiff has brought up for review a determination of the State Agricultural and Stabilization Committee requiring the refund of Soil Bank payments previously made to him. The defendant, by counterclaim, seeks the imposition of a civil penalty against the plaintiff.

The plaintiff was and is the owner of a 160-acre farm in Ida County near Holstein, Iowa. For a number of years he has resided on it. His main activity on that farm has been the feeding of cattle and hogs. On or about April 23, 1957, the plaintiff entered into a Soil Bank 1957 Acreage Reserve Agreement with the Secretary of Agriculture under the provisions of Section 1821, Title 7 U.S.C.A. Matters in connection with such Agreements are handled in behalf of the Secretary by County and State Agricultural Stabilization and Conservation Committees. They are generally referred to as County ASC and State ASC Committees. The plaintiff's matters in connection with his Acreage Reserve Agreement were handled by the Ida County ASC Committee and the Iowa State ASC Committee.

The Soil Bank 1957 Acreage Reserve Agreement entered into by the plaintiff contained a provision which provided, in part:

"No crop shall be harvested from the acreage reserve after this agreement is filed with the county committee and prior to January 1, 1958, and the acreage reserve shall not be grazed after such filing of the agree-

ment and before January 1, 1958 * * * "

Section 485.286 of the Code of Federal Regulations relating to Soil Bank Acreage Reserve Agreements provides, in part, as follows:

"Where the acreage reserve is grazed in violation of an Acreage Reserve Agreement, the amount of the forfeiture or refund shall be as specified below in this section.

"(a) If the acreage reserve is knowingly and willfully grazed by any person connected with the farm, * * * the entire amount payable or paid to the operator shall be forfeited or refunded. * * * (In addition to the forfeiture or refund prescribed in this subpart, section 123 of the Soil Bank Act provides for a civil penalty for knowingly and willfully grazing any acreage in violation of an Acreage Reserve Agreement.)

"(b) If the acreage reserve is grazed as the result of gross negligence on the part of any person connected with the farm, * * * compensation shall be forfeited or refunded to the same extent and in the same manner as prescribed in paragraph (a) of this section for knowingly and willfully grazing the acreage reserve."

Section 1831(d), Title 7 U.S.C.A., by its terms applicable to Conservation Reserve Contracts is, by Section 1821(a)(i), Title 7 U.S.C.A., made applicable to Acreage Reserve Contracts. That Section provides, in part:

"A contract shall not be terminated * * * unless the nature of the violation is such as to defeat or substantially impair the purposes of the contract. * * * "

Section 1821(a)(i), Title 7 U.S.C.A., requires that the Acreage Reserve Contracts shall contain a promise under which the producer agrees:

"In the event that the Secretary determines that there has been a violation of the contract at any stage * * * and that such violation is of such a substantial nature as to warrant termination of the contract, to forfeit all rights to payments or grants under the contract, and to refund to the United States all payments and grants received by him thereunder * * * "

Section 1811, Title 7 U.S.C.A., provides as follows:

"Any producer who knowingly and willfully grazes or harvests any crop from any acreage in violation of a contract entered into under section 1821 or 1831 of this title shall be subject to a civil penalty equal to 50 per centum of the compensation payable for compliance with such contract for the year in which the violation occurs. Such penalty shall be in addition to any amounts required to be forfeited or refunded under the provisions of such contract, and shall be recoverable in a civil suit brought in the name of the United States."

The plaintiff's farm is square in shape. The farm buildings are located near the southwest corner of the farm. Because of the plaintiff's extensive feeding operations, he has a number of feed lots and pastures on the farm. Immediately to the south of the farm buildings there are feed lots and a pasture extending to the eastern line of the farm. Immediately to the north of the farm buildings there is a rather small hog pasture. Immediately to the north of that hog pasture there is a larger rectangular hog pasture.

The plaintiff had been raising corn on his farm and had a corn allotment of 38.3 acres. Therefore, he was eligible to place that number of acres into the Soil Bank. The plaintiff placed into the Soil Bank a tract of ground running from east to west across the northern part of the farm. This tract contained approximately 20 acres. The north line of this Soil Bank tract was the north line of the farm. There was originally included in the Soil Bank Agreement a small tract of land used as a silage pit, but the silage pit was later removed from the Agreement.

Immediately to the south of that Soil Bank tract there was a large tract which in 1957 was put into hay, soybeans, and grain sorghum. The plaintiff also placed into the Soil Bank a tract which commenced immediately to the east of the farm buildings and extended east to the eastern line of the farm. This tract contained about 18 acres. Under the Soil Bank Agreement the plaintiff was to receive compensation at the rate of $50 per acre for the land placed in the Soil Bank. The maximum compensation payable to the plaintiff was $1,915.

In the spring of 1957 the plaintiff planted oats mixed with alfalfa in the two Soil Bank tracts. In June, 1957, he clipped the oats on the two tracts as required by the applicable regulations. The Soil Bank acreage was, subsequent to the execution of the Soil Bank Agreement, adjusted by omitting therefrom the silage pit at the west end of the north Soil Bank tract. Later the plaintiff was paid the sum of $1,910 as compensation for his land in the Soil Bank. On or about May 22, 1958, the plaintiff was notified by the Ida County ASC Committee that he had violated his Soil Bank Agreement in that he had grazed the acreage reserve. A hearing was had as to the matter of the claimed violation before the Ida County ASC Committee on June 4th, 1958, which was attended by the plaintiff. On June 20, 1958, the Ida County ASC Committee recommended to the State ASC Committee that the plaintiff be required to refund the Soil Bank compensation previously paid him and that in addition the plaintiff be subjected to a penalty of 50 per cent of the payment. On June 13, 1958, the plaintiff was notified of his right to appear before the State ASC Committee in connection with the matter. The plaintiff made no request to appear before that Committee. On July 16, 1958, the State ASC Committee determined that the plaintiff had violated his Soil Bank Agreement by grazing acreage that was included in that Agreement. That Committee further determined that the plaintiff should refund the $1,910 Soil Bank compensation previously paid him and that a civil penalty in the amount of $957.50 should be imposed. That amount was one-half of the maximum compensation of $1,915 specified in the Soil Bank Agreement. On October 13, 1958, the plaintiff filed his complaint herein asking that the determinations of the State ASC Committee be reviewed in accord with the provisions of Section 1831(d), Title 7 U.S.C.A. The defendant filed an answer and counterclaim. In its counterclaim the defendant asked judgment against the plaintiff for a civil penalty in the amount of $957.50. By a pretrial order entered in this case pursuant to agreement of the parties, the trial of this case was postponed pending the decision on appeal of the case Maxwell v. Benson, D.C.N.D.Iowa 1959, 173 F.Supp. 75 (Judge Beck). That case was thought to involve questions similar to the questions involved in this case. On April 12, 1960, the United States Court of Appeals affirmed. United States v. Maxwell, 8 Cir., 278 F.2d 206.

It was heretofore noted that in the spring of 1957 the plaintiff planted oats mixed with alfalfa on the two Soil Bank tracts. Oats when planted with alfalfa is known as the nurse crop. It furnishes protection to the alfalfa until the alfalfa can get a good start. Alfalfa so planted is known as the forage crop. After such alfalfa has had a substantial growth, it is suitable for grazing, at least until frost. It appears that frosted alfalfa tends to cause bloat in cattle.

On the north Soil Bank tract a fairly good stand of alfalfa developed. On the south Soil Bank tract the alfalfa did very poorly. After the nurse crop was clipped the clippings matted down and to a great extent stifled what alfalfa had survived up to that time. Because of that situation that tract became covered with and infested by foxtails, smartweeds, and thistles. In the later part of the summer, the plaintiff attempted to eradicate the thistles in that tract by means of a spring tooth harrow. A spring tooth harrow is around 12 feet in width and digs into the ground for the purpose of digging out the roots of the thistles. The plaintiff spring

toothed about three-fourths of the south Soil Bank tract. After the spring tooth harrow passed over that portion of that tract the portion had the appearance of plowed ground.

In 1957, the area between the two Soil Bank tracts was used by the plaintiff to raise soybeans, grain sorghum, and hay. The fences between the Soil Bank tracts and the other land and around the various feed lots and pasture consisted of either woven wire with barb wire above or a single wire charged with electricity which will give shock if stock come in contact with it. The fences were the usual type of fences used by farmers, were well constructed, and were well kept up. For a case involving failure to maintain fences in connection with a Soil Bank Agreement, see Goering v. United States, D.C.N.D.Iowa 1960, 183 F.Supp. 170.

The north Soil Bank tract is referred to in the evidence as Tract "A" and the south Soil Bank tract is referred to as Tract "B." There was no water available for stock in Tract "A." There the situation was similar to Tract "B," except that Tract "B" was sufficiently close to the farm buildings so that by lengthening water pipes water could be conveyed to a tank or tanks in Tract "B." There was evidence that at one time a few small pigs were seen on Tract "A" and that at another time a few calves were seen on the same tract. It appeared that in December, 1957, during a snowstorm, some cattle drifted along with the wind from the area south of Tract "A" until they came to the northeast corner of the tract. They were promptly removed from that tract. However, it clearly appears that whatever incursions of stock there may have been into Tract "A," they were trivial and insignificant.

Early in November, 1957, the plaintiff did some terracing from the small hay pasture just north of the farm buildings and across Tract "B." In connection with that terracing it was necessary to take down the fences. The fences were down for two or three days. During that time some of the hogs in the hay pasture followed along the terracing. They were soon put back and the fences put up again. This incursion of the hogs was trivial and insignificant. Prior to around October 21, 1957, the plaintiff had around 200 head of cattle on his farm. Starting around October 21, 1957, he purchased a large number of western range cattle. From October 21, 1957, and up until the latter part of December, 1957, the plaintiff had around 500 head of cattle on his farm. By October 21, 1957, the only vegetation on Tract "B," consisting of foxtails, had gone to seed and fallen to the ground. They had also been subjected to frost. Some of the western range cattle were very wild and hard to contain. The cattle were kept in the feed lot and pasture south of Tract "B." Soon after the arrival of the western range cattle, one of the group—a very wild steer—jumped over the fence into Tract "B." The plaintiff was unable to capture that steer and it was two or three days before it was induced to return to the feed lot and pasture. Some time later about twenty head of western range cattle escaped from the feed lot and pasture. About half of them went over onto a neighbor's land and about half of them got onto Tract "B." The plaintiff, by making use of two horses, was able to round up the escaped cattle and get them back onto their feed lot and pasture. It is probable that at other times prior to the forepart of December some of the western range cattle may have jumped the fence and got into Tract "B" for brief periods. During that period there was no water available for cattle on Tract "B" and, as noted, the only vegetation on it was frostbitten and dead foxtails. It appears that cattle will not eat foxtails unless they are more or less starved into it. The plaintiff's cattle had plenty of dry feed available in the feed bunks in the feed lot and pasture. Because of the lack of water and lack of suitable food on Tract "B," any cattle staying on Tract "B" during that period would lose weight during such stay.

The real controversy as to cattle being on Tract "B" is centered around their

being there in December, 1957. There was a creek running through the feed lot and pasture south of Tract "B." A dam had been built in that creek which caused a pond to form. Because of the creek and the pond, an area in that feed lot and pasture tended to become muddy. This was especially true where there were a large number of cattle in the feed lot and pasture. By December, 1957, the area in the feed lot and pasture had become quite muddy. Early in December, 1957, a number of the plaintiff's cattle sickened. The plaintiff called Dr. R. S. Porterfield, a licensed veterinarian. He diagnosed the sickness as being Bovine Leptospirosis. A number of cattle later died from the disease. Dr. Porterfield informed the plaintiff that the disease was apparently being conveyed by the cattle drinking stale water from the pond formed by the dam. There was a tank in the feed lot and pasture into which fresh water was pumped, but the cattle would, from time to time, drink from the pond. Dr. Porterfield directed the plaintiff to remove the cattle from the feed lot and pasture. It was necessary that the cattle have fresh water from the farmstead available in the area to which they were to be moved. The cattle, at the time the disease appeared, were being fed corn, oats, hay, and silage from feed bunks located in the feed lot and pasture. Shortly after receiving the directions from Dr. Porterfield, the plaintiff caused the greater number of the feed bunks in the feed lot and pasture to be moved to the west end of Tract "B" near the farmstead. He also put a water tank in that area and arranged so that fresh water could be pumped into it. Starting with the second week of December, 1957, the plaintiff used the area in question as a feed lot for the greater part of his cattle. It also appears that the plaintiff desired to make use of the area as a feed lot because of the muddy condition of the feed lot and pasture south of Tract "B." The plaintiff's necessities in the matter of changing feed places would not, of course, either justify or excuse the violation of his Soil Bank Agreement.

In the new feeding place the cattle were fed silage, corn, hay, and oats by means of the feed bunks. Snow had begun to fall around the middle of November, 1957, and by the time the cattle were moved to their new feeding place there was about a foot of snow on the ground in the general area. The only vegetation on Tract "B" at the time consisted of frozen and dead foxtails which lay on the ground under the snow. The provision in the Soil Bank Agreement as to grazing expired by its terms on January 1st, 1958. The plaintiff continued to use the area in question for feeding purposes during the rest of the winter.

█ It is the contention of the defendant that the State ASC Committee correctly determined that the plaintiff had violated his Soil Bank Agreement by grazing Soil Bank acreage, and that he did so knowingly and willfully. It is the contention of the plaintiff that he did not do so. Section 1831(d), Title 7 U.S.C.A., provides that in cases such as this the action in the district court shall be a trial de novo. Because of the provision for a trial de novo, the plaintiff, at the opening of the trial, contended that the defendant, and not he, had the burden of proof as to the correctness of the determination of the State ASC Committee. The same question was raised in the case of Baltensperger v. United States, D.C.Neb.1959, 174 F.Supp. 601, in which the producer was seeking to set aside a determination of the State ASC Committee determining that he should refund the Soil Bank payments. Judge Van Pelt held that the burden of proof was upon the producer. The view of this Court as to that matter is in accord with the view of Judge Van Pelt. It is the holding of the Court that the plaintiff has the burden of proving that the State ASC Committee erred in its determination. In order to establish that the State ASC Committee did err in its determination, it was necessary for the plaintiff to establish either (1) that there was no violation, or (2) that if there was a violation it was not of such a nature as to defeat or substantially impair the purposes of the Agreement.

The plaintiff did establish that any incursions of livestock into Soil Bank acreage prior to December, 1957, were temporary in character and trivial in significance. The main controversy between the parties is as to the use the plaintiff made of a portion of the Soil Bank acreage in December, 1957. · It is the contention of the plaintiff that such use did not constitute "grazing" and hence did not constitute a violation of the provision of the Soil Bank Agreement forbidding the "grazing" of Soil Bank acreage. The plaintiff in this connection argues that the Soil Bank Agreement does not contain provisions forbidding the presence of livestock on Soil Bank acreage. He further argues that the only pertinent provision of that Agreement provides only that the Soil Bank acreage shall not be "grazed." The provision referred to provides, in part:

"No crop shall be harvested from the acreage reserve after this agreement is filed with the county committee and prior to January 1, 1958, and the acreage reserve *shall not be grazed* after such filing of the agreement and before January 1, 1958 * * *" (Emphasis supplied.)

The plaintiff asserts that where there is no herbage or other vegetation which can or will be eaten by livestock there can be no grazing and that one cannot be properly charged with grazing land which is not capable of being grazed.

The case of Maxwell v. Benson, D.C. N.D.Iowa 1959, 173 F.Supp. 75 (Judge Beck) had to do with the forfeiture of Soil Bank payments for violation of the grazing provisions of a Soil Bank Agreement. In that case it was claimed that some colts had grazed on Soil Bank acreage. The acreage had been planted into grass in May. There was no evidence as to whether the grass could have been subject to grazing at the time the colts were alleged to have been on the Soil Bank acreage. The Court, in referring to the term "grazing," stated (at page 81):

"* * * Webster's New International Dictionary, Second Edition,

defines and uses the term as follows: '1. Grazing: A pasture; growing grass. 2. Grazing: That grazes.· 1. Graze: (1) To feed or supply (cattle, sheep, etc.) with grass or pasture. 'A field or·two to graze his cows.' (2) To feed on; to eat (growing herbage); to eat grass from (a pasture); to browse. (3) To tend (cattle, etc.) while grazing. * * * Intransitive: (1) To eat grass; to feed on growing herbage; as cattle graze on the meadows. (2) To yield grass for grazing.' "

On appeal, as heretofore noted, the decision of the trial Court in that case was affirmed. United States v. Maxwell, 8 Cir., 1960, 278 F.2d 206. In the affirming opinion the Court stated (at page 212):

"* * * Prior to July there was little if anything growing upon the reserve acres upon which to graze. There is no evidence from any witness of any visible effect upon the reserve acres caused by any grazing. The trial court, in its opinion, set out dictionary definitions of grazing to the effect that grazing means feeding on growing herbage. There is serious doubt whether there is any substantial proof of any grazing. Any nourishment which the colts might have obtained from the reserve acres would appear to be extremely insignificant. In any event, it is entirely clear that there is no proof that any grazing that might have taken place on the reserve acres went to such an extent as to defeat or impair the purposes or objectives of the Soil Bank Act."

It was heretofore noted that all except a few acres of the end of Tract "B" had been plowed by means of a spring tooth harrow. The plaintiff asserts that if the entire tract had been plowed there could not conceivably have been anything on the tract which could be grazed. The plaintiff further asserts that since the only vegetation on the few acres of the tract that had not been plowed consisted of frozen and dead foxtails on the ground

buried under a foot of snow the situation was in fact no different than it would have been had the entire tract consisted of plowed ground.

█ The statements in the opinion in the Maxwell case heretofore set out lend some support for the view that one who is a party to the Soil Bank Agreement cannot properly be chargeable with having wrongfully grazed acreage placed in the Soil Bank thereunder where such acreage could not be subject to grazing because of lack of grazable vegetation. The Soil Bank Agreement is a long, detailed and carefully prepared document. If it were the intent of the Secretary of Agriculture that the presence of livestock on the Soil Bank acreage was to be prohibited at all times regardless of the situation as to grazable vegetation, all that would be required to manifest such intent would be a short provision to the effect that no livestock should be permitted on the Soil Bank acreage during the period from the signing of the Agreement to the January 1st following. It is the view of the Court that where a tract has been placed in reserve under a Soil Bank Agreement and livestock are present on that tract between the time of the filing of the Agreement with the county committee and the January 1st following, it gives rise to the presumption that the producer who is a party to such Agreement is violating the provision against grazing contained in such Agreement. However, it is the view of the Court that such presumption is not conclusive and that it is open to such producer to establish that in fact there was no violation of such provision because of the lack of grazable vegetation on the acreage reserve.

However, if it should be deemed that the presence of livestock on the acreage reserve constitutes a violation of the grazing provision contained in a Soil Bank Agreement, notwithstanding the absence of grazable vegetation, then under the doctrine of the Maxwell cases the end result would be the same. Under the doctrine of the Maxwell cases the presence of livestock on the acreage reserve under those conditions would not be considered a substantial violation.

█ In the present case the plaintiff at all times admitted that he used Tract "B" as a feeding place for his cattle during the last three weeks of December, 1957. The presence of his cattle on that tract during that period gave rise to the presumption that he was violating his Soil Bank Agreement. However, he has established by clear and satisfactory evidence that his cattle during all that time had readily available to them in bunks ample supplies of hay, silage, corn, and oats. He further established by clear and satisfactory evidence that the only vegetation remaining on Tract "B" was frozen and dead foxtails lying on the ground under a foot of snow and that such did not constitute grazable vegetation. Such being the case, the Court is of the view that the plaintiff did not commit a violation of his Soil Bank Agreement. If on the other hand the presence of his cattle on Tract "B" constituted a violation of that Agreement, it is the view of the Court that it was not such a violation as would defeat or impair the purposes or objects of the Soil Bank Act because it was lacking in substantiality. In the case of White v. United States, D.C.Tenn. 183 F.Supp. 591, it was held that the use for a short time of Soil Bank acreage for the enclosure of cattle where the only vegetation on the acreage was wild dead grass and the cattle were fed dry feed from feed troughs constituted only a trivial violation and did not justify the termination of the Soil Bank Agreement and the forfeiture of the payments specified therein. See also, Inman v. United States, D.C.1959, 172 F.Supp. 841.

It is the holding of the Court that the State ASC Committee erred in making the determination here under review and that such determination is invalid.

█ In the present case the defendant in its counterclaim asked judgment that a civil penalty be imposed upon the plaintiff. Where there is no forfeiture of the Soil Bank payments, the civil penalty provided for in Section 1811, Title 7 U.S.

C.A., cannot be imposed. United States v. Maxwell, 8 Cir., 1960, 278 F.2d 206, 213.

It Is Ordered that judgment shall be entered in accord with the holdings herein.

Under Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.A., the foregoing opinion shall constitute the Findings of Fact, Conclusions of Law, and Order for Judgment herein.